## GRUNWALD et al. v. FREESE.

### No. 15,069; August 31, 1893.

#### 34 Pac. 73.

**Evidence—Quality of Rope or Wire—Opinion.**—Testimony as to the quality of old wire rope sold by sample, that the outer wires were broken into short pieces; that the rope was "rotten, and a little broken, instead of being as the sample"; that much of it was "broken, rusty and rotten"—relates to facts open to common observation and not requiring expert knowledge.

**Evidence—Market Value of Goods.**—Merchants and Clerks of merchants in a foreign country who deal in a certain article are competent to testify as to the market value of the article in such foreign country.

**Release of Action—Necessity of Pleading.**—A Release of a Cause of action is not available unless it is specially pleaded.[1]

**Payment.**—A Debt Contracted in a Foreign Country is payable in the currency of that country, and therefore, where the creditor sues in the United States, he is entitled to recover such sum in money of the United States as equals the debt in the foreign country when it was payable.

APPEAL from Superior Court, City and County of San Francisco; J. C. B. Hebbard, Judge.

Action by Fritz Grunwald and Otto Munch, partners under the firm name of H. C. Morf & Co. against William Freese. There was a judgment in favor of plaintiffs and defendant appeals. Affirmed.

Page & Eells for appellant; Young & Powers and James Herrmann for respondents.

SEARLS, C.—This appeal is prosecuted by the defendant from a final judgment in favor of plaintiffs and comes up on a bill of exceptions. The action was brought by plaintiffs,

---

[1] Cited with approval in Holt Mfg. Co. v. Odenrider, 61 Wash. 557, 112 Pac. 671, where the defendant had contracted in writing to purchase a harvester, to be shipped to him, and by the writing expressly agreed "not to countermand this order except for failure of crops prior to the date of shipment."

factors and commission merchants at Yokohama and Hiogo, in the empire of Japan, to recover from the defendant, a merchant, in the city and county of San Francisco, $4,999.60 Mexican dollars, of the value of $4.149.67 gold coin of the United States, a balance due on a mutual, open, and current account, with interest, etc. For some time prior to 1888 defendant had shipped from San Francisco to plaintiffs in Japan, for sale by them as his factors in the Japanese market, merchandise of various kinds, and plaintiffs had also shipped Japanese goods to defendant, for sale by him in like manner, and for their account in San Francisco. On July 10, 1888, defendant wrote to plaintiffs that he could buy in San Francisco a large amount of old cable rope after it was laid aside by the cable railroad companies, and sent a sample of the rope, asking plaintiffs to notify him by return mail what they could do with the article in Japan; what quotations they could make per picul (one hundred and thirty-three and one-third pounds) in Mexican dollars, and about how many tons they could dispose of per month. Defendant also inquired if the plaintiffs would authorize him to draw on them, against consignments, for an advance of say $10 gold per ton of two thousand two hundred and forty pounds, F. O. B. (free on board), San Francisco, ninety days' sight draft, etc. Plaintiffs responded by letter under date of August 16, 1888, saying: "The article in condition like sample is very salable here, only the thickness is not suitable. People here want 13, W. G. No. 8–13 (Birmingham wire gauge), whereas your samples, according to B. W. G., measure only 16. People here do not wish wire which is thicker than No. 8 or thinner than No. 13," but that between those numbers it was desirable, and a considerable business could be done in it. Plaintiffs inclosed in a letter samples of No. 8 and No. 13 wire. They also added that, subject to defendant's approval, they had contracted for fifty tons according to his sample, but only of sizes 8 to 13, at the gross sale price of $2.50 per picul. Plaintiffs consented that defendant should draw upon them for seventy-five per cent advances of the probable net proceeds, freight and insurance paid there (San Francisco). They further stated that, "in the event the first shipment turns out satisfactory to our customers, we will easily be able to sell twenty tons per month." Defendant denied that he owed plaintiffs anything upon the

account, and by way of counterclaim sets out that he was induced by the representations of the plaintiffs to purchase and ship to them large quantities of wire cable; that he was misled by them; that they failed to notify him promptly that the cable could not be sold; and in apt terms stated facts which, if true, constituted a defense to the action. It seems that the wire rope was sent to Japan, not to be used in its then condition for mechanical purposes, but to be dissevered, and the wires contained therein to be worked into nails for tea chests, frames for umbrellas, etc. For these purposes the sizes of the wires were required to be from No. 8 to No. 13, inclusive. The two wires sent by letter to the defendant, before mentioned, were samples as to size, and not as to quality, being Nos. 8 and 13, respectively.

In rebuttal of the case made by defendant in support of his counterclaim, plaintiffs read in evidence the depositions of Ernest Decker, Theodore Bunge, Henry Lucas, Johann F. Crosser and Fritz Grunwald, taken upon interrogatories in Japan. These witnesses all testified to a greater or less extent in regard to the condition or appearance of the wire rope forwarded by the defendant, its relative condition with the sample forwarded by defendant to the plaintiffs, the market value of goods like the sample, and the market value of the goods actually shipped. Cross-interrogatories were waived by defendant's counsel, and no objections seem to have been made until the reading of the depositions at the trial, when counsel for defendant moved to strike out from each deposition, severally, certain portions thereof, viz., those portions relating to the quality of the wire rope shipped, and its comparative merits as relating to the samples; also that relating to the market price for this class of goods in Japan, upon the ground that it did not appear that the witness knew the market prices, or that he was sufficiently expert to give an intelligent opinion upon any of these matters. The objections to the several depositions were similar in language, and all based upon the same grounds. The witnesses were all either commission merchants in Japan or clerks in the employ of such merchants. The question of value, or market value, is mainly one of fact, but is usually defined as a matter of opinion gathered from facts, and as was said by Story, J., in Alfonso v. United States, 2 Story, 421: "We must necessarily resort

to opinions of merchants and others conversant in trade for market prices or values of the goods.'' Wharton, in his work on Evidence (section 447), lays down the rule as follows: ''Two essentials, therefore, exist to a proper estimate of value: First, a knowledge of the intrinsic properties of the thing; second, a knowledge of the state of the markets. As to such intrinsic properties as are occult and out of the range of common observers, experts are required to testify; as to properties which are cognizable by an observer of ordinary business sagacity, being familiar with the thing, such an observer is permitted to testify.'' So far as the condition of the wire rope was concerned, it was a question to be determined, not from its occult qualities, but from its appearance, and from the effect produced upon it by handling; that its outer wires were broken up into short pieces; that ''the goods sent were rotten, and a little broken, instead if being as the sample''; that much of it was ''broken, rusty, and rotten,'' or, as another witness said, ''in trying to undo the coils the whole thing broke to pieces, into small pieces from half an inch to two inches long.'' These were facts to be gleaned from observation, and were stated as such, facts open to every observer, and not requiring expert knowledge, and whether they were experts on the subject or were not is of little importance. The question of the value of the rope in the market was one upon which merchants dealing in the article in question were competent to speak. As before stated, the witnesses were all commission merchants in Japan, or were in the employ of such merchants; and it may be added that it appeared directly or incidentally that all of them who testified as to the value of the commodity were or had been engaged in the sale of the article, or were in the employ of those thus engaged. They all showed themselves to possess more or less knowledge of the efforts made by plaintiffs to dispose of the goods, and had themselves either sold, attempted to sell, or were familiar with the efforts made to sell the goods. Under such circumstances, while the depositions are not as full and satisfactory as could be wished in showing knowledge and experience on the part of some of the witnesses, I do not regard the errors assigned in the rulings upon the depositions as sufficiently established to warrant a reversal.

If, however, we are wrong in the foregoing conclusion, and should hold that the depositions were, so far as objected to, improperly admitted, it is not perceived that the court below would have been justified in reducing the amount of plaintiffs' recovery. The balance of account in favor of plaintiffs was not only proven, but at the trial, in answer to a question by the court, "defendant's counsel announced that there was no contest on the account at all, but as an offset defendant relied on plaintiffs' assurance of disposing of the rope as sent, and that defendant had suffered loss far greater than the amount plaintiffs claimed against defendant by reason of plaintiffs' failure to do what was agreed in the matter, and that defendant asked no affirmative relief, but charged that he was damaged in the sum of $5,000 in round numbers." The case as made by the defendant failed to establish a counterclaim, and hence the evidence objected to, which tended to show why consigned goods brought no higher price, and were not sooner disposed of, was unnecessary. .

There is a further contention that plaintiffs released defendant from the balance due them. On the third day of June, 1889, the plaintiffs, in a letter to defendant, used the following language: "Naturally you know very well that we will never consent to proceed against you legally. Our hope to reduce our loss in this transaction, if possible, to a minimum limits itself, therefore, that after the settlement of your different transactions the loss will be small," etc. Conceding, without deciding, that the quoted clause of plaintiffs' letter amounted to a release, then it should have been specially pleaded: Moss v. Shear, 30 Cal. 468; Piercy v. Sabin, 10 Cal. 22, 70 Am. Dec. 692; Coles v. Soulsby, 21 Cal. 47. There was no consideration for the promise, and therefore it did not amount to a covenant not to sue: Upper San Joaquin Canal Co. v. Roach, 78 Cal. 552, 21 Pac. 304. It is apparent, however, that neither of the parties regarded the letter as amounting to a release. In the following December we find defendant writing to plaintiffs: "I refuse to participate in the loss caused by your fault and recommendations, with more than that already suffered, which amounts to nearly thirty per cent," to which plaintiffs reply: "We hope soon to find the opportunity to dispose of the goods, and after a thorough inspection we shall consult with our Yokohama

house as to what steps we shall take to compel you to the liquidation of this debt.''

The account in Japan was kept, as appears, for convenience' sake, in Mexican dollars. Plaintiffs aver that on the seventh day of August, 1890, there was due them $4,999.60 Mexican dollars, of the value of $4,149.67 gold coin; that on or about August 26, 1890, they submitted their account to defendant, and demanded payment, and pray judgment for such sum, with interest. It was stipulated that Mexican dollars were at the date of the commencement of the suit worth 83 cents. At the date of the demand (August 23, 1890) they were worth ninety-three and one-half cents, and at the date of trial seventy-four to seventy-five cents. The court gave judgment for the value at the date of suit brought. This was more favorable to defendant than it would have been to have computed the value of the foreign silver at the date of the demand of payment, but not as advantageous to him as a computation at the date of trial. A debt contracted in a foreign country, in the absence of a contrary understanding, is payable there, and in the legal currency of that country. The parties having, by common consent, expressed their account in Mexican dollars, and the debt having been contracted in Japan, it stands on the same footing as though Mexican dollars were the currency of that country. It follows that, the debt not having been paid in Japan, and plaintiffs being compelled to sue here, they were entitled to judgment for such sum in our currency or money as was equivalent to their claim in Japan: Benners v. Clemens, 58 Pa. 24; Cash v. Kennion, 11 Ves. 315. In the language of the chancellor in the case last cited: ''Where a man agrees to pay £100 in London upon the 1st of January, he ought to have that sum there upon that day. If he fails in that contract, wherever the creditor sues him the law of that country ought to give him just as much as he would have had if the contract had been performed.'' Apply the principle thus enunciated to this case, and we may say that, had defendant met his contract when it was due—that is to say, when demand was made upon him—plaintiffs would have had $4,999.67 Mexican dollars of the value of ninety-three and one-half cents each, or their equivalent in our currency; a sum in excess of that which the court awarded them. If a man contracts to deliver wheat on a given day,

and fails to do so, the measure of damages is the market price of the article on that day; and in principle it is difficult to see why the rule should not hold good when he agrees to deliver Mexican dollars, or other foreign money, which in the absence of some positive law of our own, is but a commodity. There are authorities which hold that the rate of exchange at the date of the trial is the criterion by which to determine the amount of the judgment, but in most instances the only question evidently relates to the mere expense of effecting the exchange, or, in other words, the cost of transmitting the funds, for that is what it amounts to—cases in which, so far as appears, the question of depreciation or appreciation of the currency in which the debt was payable cut no figure. In Benners v. Clemens, supra, cited by appellant, the recovery was had upon the basis of the value of legal tenders at the date of the presentation of the account. To discuss the question satisfactorily would require more space than can reasonably be accorded to it, and I content myself with saying that my conclusion, drawn from a perusal of the conflicting authorities, prompts the declaration that if any error was committed by the court below it was in favor of the defendant, and hence that he is not in a position to complain. The evidence supports the findings, and the latter covers the issues in the case, and the judgment appealed from should be affirmed.

We concur: Belcher, C.; Haynes, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment appealed from is affirmed.