### GUINESS et al. v. MILLER, Alien Property Custodian, et al.

(Circuit Court of Appeals, Second Circuit. April 14, 1924.)

#### No. 236.

**1. Payment ⟨⟩12(5)—Recovery for breach of contract to pay in foreign money is measured by value of such in money of the United States at time of breach.**

An indebtedness by a German subject to an American citizen on a stated account, payable in marks, on recovery in a court of the United States, is measured by the value of the marks, in American money at the time the account was stated and the right to indemnity for its nonpayment accrued.

**2. War ⟨⟩34—Treaty with Germany held not to affect rate of exchange or interest in suit by citizen against Alien Property Custodian to recover debt due from German subject.**

The Treaty of Versailles, included in the treaty of peace with Germany with reference to rates of exchange and interest in settlement of claims between nationals of the countries, has no application to a suit under Trading with the Enemy Act, § 9, as amended (Comp. St. Ann. Supp. 1923, § 3115½e), when the purpose of the suit is to collect a debt owing to an American citizen out of property of an enemy in the United States, which has been seized by the Alien Property Custodian and is now held by the Treasurer of the United States.

**3. Interest ⟨⟩55—Not recoverable on indebtedness from enemy alien to citizen during the war.**

Interest is not recoverable on an indebtedness from an enemy alien to a citizen of the United States for the time during which intercourse between them was interdicted by Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.).

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Benjamin Guiness and others against Thomas W. Miller, Alien Property Custodian, and others. From the decree, both parties appeal. Affirmed.

For opinions below, see 291 Fed. 768, 769.

Van Vorst, Siegel & Smith, of New York City (Alexander B. Siegel, of New York City, of counsel), for plaintiffs.

William Hayward, U. S. Atty., of New York City, and Dean Hull Stanley and A. R. Johnson, Jr., Sp. Asst. U. S. Attys., both of Washington, D. C., for defendants.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

MANTON, Circuit Judge. This suit is instituted under section 9 of the Trading with the Enemy Act (40 Stat. 411), as amended (Comp. St. Ann. Supp. 1923, § 3115½e), to recover from the Alien Property Custodian or the Treasurer of the United States the property of Delbruck, Schickler & Co. for an indebtedness admitted to be due on an account stated as of December·31, 1916. On April 6, 1917, Delbruck, Schickler & Co. were indebted to the plaintiffs in the sum of 1,079.35 marks as of January 1, 1916, and this was acknowledged by that firm when the account was stated December 31, 1916. Thereafter there were no dealings between the parties. It is conceded that there was a separate indebtedness due to the defendant Delbruck, Schickler & Co. of $35.35. Section 9 of the Trading with the Enemy Act authorizes the present proceeding.

The only questions presented here are law questions, since the facts have been stipulated. They are: (1) What rate of exchange should the court adopt in calculating the amount of the defendants' indebtedness in marks into money of the United States? (2) Was the plaintiff entitled to interest upon the indebtedness owing by Delbruck, Schickler & Co. during the war period between April 6, 1917, and July 14, 1919 —that is, from the date of the entry of the United States into the world war to the date of the issuance of the general license by the War Trade Board permitting communication and commercial transactions between citizens of the United States and citizens of Germany? The plaintiffs contend the rate of exchange to be that which existed on the date of the account stated—the date of the breach of contract—whereas the defendants contend for the date as of the date of the entry of the final decree. It is stipulated that on December 31, 1916, the value of the ·mark was 17½ cents United States currency, and on the date of the decree it was $\frac{1}{25000}$ of a cent. The Trading with the Enemy Act provides:

"Sec. 9. (a) That any· person not an enemy or ally of enemy, * * * to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof shall have been .conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, may file with the said Custodian a notice of his claim under oath and in such form and containing such particulars as the said Custodian shall require; and *the President, if application is made therefor by the claimant, may order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States, or of the interest therein to which the President shall determine said claimant is entitled.* * * * If the President shall not so order within sixty days after the filing of such .application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of thirty months after the end of the war, institute a suit in equity * * * to establish the * * * debt so claimed, and, if so established. the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian or by the Treasurer of the United States or the interest therein to which the court shall determine said claimant is entitled; * * *

"(e) * * * Nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917."

[1] It is a pre-war debt that can be recovered under the act, and that debt must necessarily be measured in dollars. Marks could not be paid by the Alien Property Custodian, either on order of the President or of the court. The statute must be read in the light of coexisting and collateral provisions of law and in the absence of any statute law or common law requiring a different conclusion, the correct inference from the provisions of the Trading with the Enemy Act is that the value of pre-war debts recoverable under the act is to be taken as of their pre-war value. Any other conclusion would cause confusion and a lack of uniformity in the application of its provisions. It would distort the statute under which the suit is brought to hold that the amount of the debt recoverable thereunder was available, depending upon the date of judgment. Such a construction would nullify that portion of the statute which permits the president to order the payment of the debt without a judgment.

In Birge-Forbes Co. v. Heye, 248 Fed. 636, 160 C. C. A. 536, affirmed 251 U. S. 317, 40 Sup. Ct. 160, 64 L. Ed. 286, a contention was presented as to whether the mark should be computed at its normal value, or at the value which it had at the time of the trial, and the court said that the purpose of the judgment was to make the plaintiff pay for the amount which he paid out in discharging the obligations of his principals, and held that, the evidence failing to disclose any depreciation of the German mark at the time of this payment, the assumption should be that the value of the mark was at that time the normal value, and that the judgment should be predicated upon such value. The Supreme Court affirmed this conclusion. The rate of exchange on the date of the inquiry or breach of contract is the measure for transferring the indebtedness into the United States currency. This principle met with the approval of the Circuit Court of Appeals for the Fifth Circuit in Wormser Bros. v. G. Marroquin & Co., 249 Fed. 428, 161 C. C. A. 402, and of Judge Rose in Page v. Levenson (D. C.) 281 Fed. 555, and of the highest court of the state of New York in Hoppe v. Russo-Asiatic Bank, 235 N. Y. 37, 138 N. E. 497, in Illinois in Simonoff v. Granite City National Bank, 279 Ill. 248, 116 N. E. 636, and in New Jersey in Katcher v. American Express Co., 94 N. J. Law, 165, 109 Atl. 741. The House of Lords of England has reached the same conclusion. See S. S. Celia v. S. S. Vulturno, [1921] 2 A. C. 544, British-American Continental Bank, Ltd., in re Goldzicher and Penso's claim, [1922] 2 Ch. 575, and Uliendahl v. Pankhurst Wright & Co., K. B. Div. July 6, 1923, 39 Times L. R. 628.

We regard this rule as applicable, whether the action be in contract or in tort. Primarily the plaintiff is entitled to recover a sum expressed in foreign money. In theory, he is to be made whole for the injury suffered at the time. The judgment which grants him the relief should express in our currency the rate of exchange prevailing at the date of the breach of the contract or at the date of the commission of the tort. We see no sound reason for a different rule to be applicable, in the administration of justice to an injured claimant, when his right of recovery is through an action in tort rather than in a case of contract. Such is the rule announced in the authorities above referred to.

[2] We are referred to various provisions of the Treaty of Versailles and the treaty of peace with Germany proclaimed November 14, 1921 (42 Stat. 1939), as bearing on this subject, but we are of the opinion that the specific provisions of the rate of exchange in the Treaty of Versailles and the reference to that treaty in the separate treaty of peace between Germany and the United States, do not detract from the conclusions reached above. It is the contention of the claimants that subdivision 14 of the annex to section IV of part X of the Treaty of Versailles, which is included in the treaty between the United States and Germany, makes provision for the rate of exchange and the rate of interest which is to be used in settling claims such as the plaintiffs' in this action. It provides:

"The provisions of article 297 and this annex, relating to property, rights and interests in an enemy country, and the proceeds of the liquidation thereof, apply to debts, credits and accounts, section III regulating only the method of payment.

"In the settlement of matters provided for in article 297 between Germany and the Allied or Associated States, their colonies or protectorates, or any one of the British Dominions or India, in respect of any of which a declaration shall not have been made that they adopt section III, and between their respective nationals, the provisions of section III respecting the currency in which payment is to be made and the rate of exchange and of interest shall apply unless the government of the Allied or Associated Power concerned shall within six months of the coming into force of the present treaty notify Germany that the said provisions are not to be applied."

The United States has not made a declaration adopting section III. It has given no notice rejecting the provisions of section III respecting the currency in which payments of debts are to be made, and the rate of exchange and the rate of interest. The specific provisions as to the rate of exchange in the Treaty of Versailles are to be found in subdivision D of article 296. This is a part of section III. Article 296 makes provision for the settlement of debts payable before the war and due by a national of one of the contracting parties residing within its territory to a national of an opposite power residing within its territory. The provision makes for the payment and collection of such debts through a clearing house, which is established. The rate of exchange provided is that rate which is fixed in the settlement of debts in such clearing house. Article 296 does not apply as between Germany on the one hand and any of the alien or associated powers, unless within a period of one month from the deposit of the ratification of the present treaty a notice to that effect is given to Germany by the government of the power adopting the provisions. It is conceded no such notice was ever given to Germany by the United States that it adopted the provisions of article 296. Therefore we see no reason why the provisions of article 296 apply to the United States, as no debts existing between the nationals of the United States and the nationals of Germany are settled by the clearing house.

Subdivision 3 of the annex to article 296 makes provision that the parties to the clearing house arrangement will prohibit within their territory all legal process relating to the payment of enemy debts, except in accordance with the provisions of the annex. It is not contended here that article 296 is binding upon the United States. It is said that

subdivision 14 to section IV of part X makes provision as to the rate of exchange to be used and interest to be allowed upon the claims other than those provided for in the clearing house. There is a specific reference in subdivision 14 that:

"The provisions of article 297 and this annex, relating to property, rights and interests in an enemy country, and the proceeds of the liquidation thereof, apply to debts, credits and accounts, section III regulating only the method of payment."

Article 297 has no reference to payment of debts of Germans due an American. In part of section IV of article 297, which is headed "Property Rights and Interest," provision is made for dealing with and liquidation of property belonging to nationals of allied and associated powers who were in Germany during the war, or property of Germans which was within the territory of the allied and associated powers during the war. It is true that subdivision 14 of the annex to section IV includes debts, credits, and accounts, but that is a provision under article 297, which does not deal with the payment of debts between nationals of various powers, shall include within its scope not only tangible property within the various countries, but also intangible. Credits are made property within the meaning of article 297 between Germany and the associated states and between their respective nationals. The provision of section III respecting currency in which payment is to be made and the rate of exchange and interest shall apply unless the governments of the allied and associated powers concerned shall, within six months of the coming into force of the present treaty, notify Germany that such provisions are not to be applied. Subdivision 14 provides that in the settlement of matters provided for in article 297, the provisions as to the rate of exchange and interest provided for in section III shall apply. And article 297 provides for the liquidation by the allied and associated powers of all property rights and interest belonging, at the time of the coming into force of the present treaty, to German nationals and companies controlled by them within the territories of the allied and associated powers. Thus the provisions as to the rate of interest and exchange provided for in section III are made applicable to article 297 by subdivision 14 of the annex to section IV, namely, in the instance of the liquidation of properties of Germans within the United States.

Subdivision E of article 297 provides that nationals of the Allied and Associated Powers shall be entitled to compensation with respect to damage or injury inflicted upon their property rights or interests, including any company 'or association in which they are interested in German territory as it existed on August 1, 1914. This is another instance where the rate of exchange and interest applied, namely, where Germany liquidates the property of American nationals where the property was in Germany as of August 1, 1914, Germany must use the rate of exchange and interest provided for in section III. We regard these provisions of article 297 as having no application to a suit under section 9 of the Trading with the Enemy Act, when the purpose of the suit is to collect a debt owing to an American citizen out of the property of an enemy in the United States, where the property has been seized

by the Alien Property Custodian and now held by the Treasurer of the United States. The rate of exchange is in no way provided for, if such procedure is instituted under article 297 of the Treaty of Versailles.

The treaty of peace with Germany (42 Stat. 1939), of which ratifications were exchanged on November 11, 1921, contains the following:

"Article I. Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities, reparations or advantages specified in the aforesaid joint resolution of the Congress of the United States of July 2, 1921, including all the rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles which the United States shall fully enjoy notwithstanding the fact that such treaty has not been ratified by the United States.

"Article II. With a view to defining more particularly the obligations of Germany under the foregoing article with respect to certain provisions in the Treaty of Versailles, it is understood and agreed between the high contracting parties:

"(1) That the rights and advantages stipulated in that treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in section 1, of part IV, and parts V, VI, VIII, IX, X, XI, XII, XIV, and XV.

"The United States in availing itself of the rights and advantages stipulated in the provisions of that treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions."

By a reservation, Congress, on October 18, 1921 (42 Stat. 1945), as a part of the resolution of ratification of the German treaty, provided that:

"The rights and advantages which the United States is entitled to have and enjoy under this treaty embraced the rights and advantages of nationals of the United States specified in the joint resolution or in the provisions of the Treaty of Versailles to which this treaty refers."

Thus all the rights and advantages stipulated in the Versailles Treaty in part X are reserved to the United States and, under the resolution of ratification, to its nationals. If anything, the Treaty of Versailles entitled citizens of every Allied or Associated Power which ratified to have pre-war debts owing to them by German nationals paid at the pre-war rate of exchange. The provisions of the treaty had no application to the questions of either rate of exchange or interest.

[3] The plaintiff is not entitled to recover interest upon this debt from the period of April 6, 1917, to July 14, 1919. During this period there was a state of war between Germany and the United States. There was a suspension of interest upon obligations existing between citizens of hostile belligerent countries under the well-recognized rules of law. At common law, interest is suspended during the period of war. Brown v. Hiatt, 15 Wall. (82 U. S.) 177, 21 L. Ed. 128. The reason has often been stated. It is that communications between citizens of hostile belligerents have become illegal, and it becomes legally impossible for the debtor to pay his debt, or the creditor to receive it. Interest is the charge for the withholding of payment of a debt, and it would be inequitable to make the charge, when it is legally impossible to pay the debt. This debt was ascertained and agreed upon. It was not paid, because payment was impossible during the period of the war.

There is no provision in the Trading with the Enemy Act which materially changes this rule of law. And by section 7 (c) of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d) the President may require the payment to him of the debt owing to the enemy. In such an event, whether or not the debt of the enemy may be paid from the funds in the hands of the Alien Property Custodian depends upon the eventuality that the President shall so require. Under section 7 (d) a debtor is permitted to pay his debt to the Alien Property Custodian only, but this must be with the consent of the President. Thus it appears that there is not an unrestricted privilege to pay a debt. It may not be paid in any event even if the debtor may so desire. In order to overcome this rule, it must appear that there was an unrestricted ability on the part of the enemy to discharge his debt. Such was the case against the Alien Property Custodian in Robertson v. Miller (C. C. A.) 286 Fed. 503. There this court held that interest ran, because the enemy had an agent in this country who was in possession of funds and had authority to pay the debt during the period of the war.

We find no error in the conclusion below. Decree affirmed.