**MILLER, Alien Property Custodian, et al. v. HUMPHREY.**[*]

(Circuit Court of Appeals, Ninth Circuit. August 3, 1925.)

No. 4447.

1. War ⊂═⊃12—Evidence sufficient to show demand by American depositor for money in German bank.

In suit under Trading With the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), by American citizen, to establish a debt claimed against a German bank, and have judgment paid from moneys impounded by Alien Property Custodian for United States, evidence held sufficient to show demand for payment of entire account prior to entry of United States into war.

2. War ⊂═⊃12—Bank, telling depositor that it availed itself of privilege of moratorium, not entitled to object that demand for payment was oral.

A German bank, having told an American depositor, attempting to withdraw funds prior to entry of United States into war, that it availed itself of privilege of moratorium, and refusing to pay deposit in full, held not entitled to object that demand was oral and not in writing.

*Certiorari granted 46 S. Ct. 106, 70 L. Ed. ——.

3. War ⚖️12—Depositor in sons' names in German bank not estopped from asserting ownership by petition to Secretary of State, joined by sons.

In suit under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), by American citizen, to establish a debt claimed against a German bank, and have judgment paid from moneys impounded by alien property custodian, where one of accounts had been placed in names of depositor's sons, depositor *held* not estopped from asserting his true ownership by verified petition, joined by his sons, making a claim to Secretary of State.

4. War ⚖️12—Depositor in German bank not guilty of laches in failing to institute suit against Alien Property Custodian before July, 1921.

A depositor in a German bank, who demanded payment in June, 1915, which was refused on privilege of moratorium, and who in October, 1919, requested assent of bank to his drawing money from funds on hand with Alien Property Custodian for payment of American claims, *held* not guilty of laches in not instituting suit before July, 1921.

5. War ⚖️12—Interest on deposit in German bank properly allowed at rate agreed by bank from refusal of payment to United States' entry in war.

In suit under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), by American citizen, to establish a debt claimed against a German bank and have judgment paid from moneys impounded by Alien Property Custodian, where plaintiff had demanded payment in 1915, which was refused on privilege of moratorium, interest for period from demand until United States entered war *held* properly allowed at rate agreed upon with bank.

6. War ⚖️12—Interest on deposit in German bank, which refused to authorize payment from funds on hand with Alien Property Custodian at depositor's request, properly assessed according to law of California.

In suit under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), by citizen of California, to establish a debt claimed against a German bank and have judgment paid from moneys impounded by Alien Property Custodian for United States, where assent to drawing money out of funds on hand with Alien Property Custodian was refused, interest *held* properly allowed under the law of California; there being no contract rate.

7. War ⚖️12—State of war with Germany actually existed from April 6, 1917, until July 2, 1921; "alien enemy."

A state of war actually existed with Germany from April 6, 1917, until July 2, 1921, and during that period a German bank was an "alien enemy" as defined by Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), notwithstanding peace was established July 3, 1919.

[Ed. Note.—For other definitions, see Words and Phrases, Alien Enemy.]

8. Payment ⚖️12(5)—Recovery of depositor in German bank properly assessed on basis of exchange at time demand was made.

In suit under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), by American citizen, to establish a debt claimed against a German bank and have judgment paid from moneys impounded by Alien Property Custodian, decree for plaintiff, based on exchange value of German mark as of time of plaintiff's demand and refusal by bank to pay *held* proper.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit by Charles Franklin Humphrey against Thomas W. Miller, as Alien Property Custodian for the United States, and others. Decree for plaintiff, and defendants appeal. Affirmed.

This suit was brought on July 9, 1921, under the Trading with the Enemy Act Oct. 6, 1917, c. 106 (40 Stat. 411, 419 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.]). The appeal is from a decree in favor of Humphrey, appellee herein, against the Deutsche Bank Filiale, Nurnberg, a German banking corporation, and Miller as Alien Property Custodian, and White as Treasurer of the United States.

Humphrey, a citizen of the United States and a resident of California, was in Germany prior to November, 1914, and deposited funds in the appellant bank in Germany. He sues to establish a debt claimed, and to have the judgment paid out of moneys of the bank impounded in the United States by the Alien Property Custodian. The deposits were made by Humphrey in 1913 in two separate accounts—one in the name of himself and his wife, subject to the order of either; and the other in the names of his two minor sons, "subject only" to Humphrey's order, or, in the event of his death, to the order of his wife. The answer of the bank denied the indebtedness as alleged, pleaded that the complaint was insufficient in failing to allege a demand for the payment, and that no demand had been made upon the bank by or on behalf of Humphrey. The Alien Property Custodian and the Treasurer of the United States answered, making formal denials, but neither participated in the trial.

The District Court held that the money in both accounts was at all times Humphrey's money, and was so regarded by the bank; that demand had been made by Humphrey about June 12, 1915; that the value of German marks reduced to American money for

the purpose of expressing the judgment should be ascertained and determined as of the date of the breach of duty, to pay, or accrual of the cause of action; and that Humphrey was entitled to recover interest from the time of the demand until the entry of the United States into the war, April 6, 1917, at the rate agreed upon by Humphrey and the bank. Between April 6, 1917, and July 3, 1919, no interest was allowed. Then from the time of the cessation of the war, July 3, 1919, interest was allowed at the legal rate of interest in California. Decree was made accordingly against the bank, and directed that payment should be made out of $34,-508.13, moneys belonging to the bank which were in possession and under the control of the Alien Property Custodian and White as Treasurer, as aforesaid.

Dunne, Brobeck, Phleger & Harrison, of San Francisco, Cal., for appellant bank.

William P. Hubbard and Grant & Zimdars, all of San Francisco, Cal., for appellee.

Before GILBERT, HUNT, and MORROW, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). Appellant bank presses the contention that, as to the joint account of Humphrey and his wife, there never was a demand for closing such account and withdrawal of the sum therein credited, and that therefore no cause of action accrued to Humphrey against the bank, and that there was no demand with respect to the account of the two sons.

[1] The substance of Humphrey's testimony was that in August, and November, 1914, and about June 12, 1915, he made a demand for the payment of the whole sums represented in the several accounts, that a director in charge of the bank told him that a moratorium had been declared, and that he could have the usual amounts that he had been accustomed to use, but not the total sum represented by the accounts. Humphrey said that after June 12, 1915, he had deposited coupons on German bonds and dividends on the bank's shares. He could not recall all the different conversations with the bank officials, but testified that in August, 1914, the bank officials looked up his accounts, asked how much he had used, and told him that he should not take any securities out of Germany; that after the August demand he had left certain German and Hungarian securities in the bank for collection.

Defendant bank made no objection of any kind to the testimony of plaintiff, and called no officer or representative of the bank to refute what Humphrey said. The bank, however, endeavors to break the force of Humphrey's evidence by reference to certain correspondence between Humphrey and the bank. It is unnecessary to set out these writings, but for convenience they may be placed in three groups: Letters exchanged before June 12, 1915; a letter written by the bank to Humphrey on June 12, 1915; and letters that were exchanged after June 12, 1915. Those exchanged before June 12th referred to deposits, interest accumulations, and to collections of bonds by the bank for the account of Humphrey. We can infer nothing more from them than that Humphrey was carrying on, and then apparently expected to continue, relations with the bank. The letter of June 12, 1915, from the bank, addressed to Humphrey at Vevey, Switzerland, contained advices to Humphrey that upon that day the bank had received from Geneva and redeemed a certain deposit certificate of the writing bank for 41,000 marks, and would render interest statement together with semiannual statement as per June 30th. We do not find anything in the letter that is inconsistent with the testimony of Humphrey that upon that day he was in Nurnberg and made a demand for all his funds. The bank, in ordinary course of business, might have formally written to Humphrey of the transaction referred to in the letter, either before or after his visit to the bank. The letters that were dated and exchanged after June 12th also impress us as ordinary correspondence pertaining to banking transactions; one directed the bank to pay certain costs of insuring and sending bonds to the Berlin bank (defendant bank's associate), another referred to a contemplated loan, with request for statements, and in one Humphrey asked for the assent of the bank to his drawing money from the bank's funds held by the Alien Property Custodian in the United States. In weighing the several letters in connection with Humphrey's oral testimony, we may look in retrospect and consider the history of the times, the unusual conditions which prevailed in Germany about and after August 1, 1914, the serious situation which then surrounded Humphrey which may have influenced his actions.

[2] We attach no significance to the fact that Humphrey's demand was oral. The bank having told the depositor that it availed itself of the privilege which usually goes with a moratorium, should not now be heard

to say that because the demand was not in writing it can avoid recognition of the obligation.

[3] Recurring to the account standing in the names of the two sons, we think it clear that Humphrey himself had control of the account during his lifetime, and that his attitude of control was made plain in December, 1913, when he wrote to the bank, saying the funds were "only drawable by me," but by Mrs. Humphrey in case of his death. Furthermore, as showing that the bank understood his letter, there are the accounts rendered by the bank, exhibiting the aggregate of the balance of the two accounts in one statement. It is true that in December, 1922, the two boys and their father made a verified petition in the way of a claim to the Secretary of State for 23,683 marks, as of April, 1917, as sole owners of the funds claimed, deposited to their order. Humphrey's explanation of this is that he had previously asserted his claim for all the money involved in this suit, and that the funds were always his and never belonged to his children; that in order to get the claims filed with the Mixed Claims Commission by January 1, 1924, he and his wife had signed the claims which were filed. There was no attempt to change the legal status or to repudiate the theretofore asserted claim of ownership, by the father, and in our opinion it would be very unjust to construe the petition as estopping him from asserting the true ownership.

It is said that the amount represented by the account standing in the names of the boys was not filed with the Alien Property Custodian, and that no notice thereof was given to the President. But the stipulated facts are that all the sums deposited in either of the accounts mentioned in the preceding paragraph of the statement were made by plaintiff from moneys which before they were deposited were the sole property of the plaintiff or of the plaintiff and his wife; also that about October 15, 1918, this plaintiff filed with the Alien Property Custodian of the United States his notice of claim in form as required by the Trading with the Enemy Act, claiming payment from funds deposited in the bank by the plaintiff, and that subsequently, about June 24, 1920, Humphrey made application to the President for the allowance of his claim, but that no action was taken then or thereafter by the President. Both accounts, one in the names of Humphrey and his wife, and the other in the names of the boys, are attached to the

statement of facts as exhibits, and the statement relates to the two. Our conclusion being that Humphrey is sole owner of the funds, we must decide what interest he should be allowed.

[4, 5] It must be accepted that between the date of Humphrey's demand, June 12, 1915, and June 30, 1917, when the German custodian took his money, the bank could and should have paid him. But it failed to do so, as did it fail to authorize payment after October, 1919, when Humphrey wrote requesting assent to his drawing the money out of funds on hand with the Alien Property Custodian for payment of American claims. The argument that Humphrey was guilty of laches ought not to prevail, for he instituted this suit in July, 1921, which fact considered with the dates given in the record, are evidence that he moved with reasonable diligence in asserting his claim. Thus far, however, he has never received an offer by the bank to pay any sum. Under such circumstances, it is fair that he should be allowed interest at the rate agreed upon by Humphrey and the bank from June 12, 1915, when the United States entered the war. From April 6, 1917, to July 3, 1919, all communication between the bank and Humphrey was cut off, and, as the lower court did not allow interest for that period, no question is presented upon the point. But after July 3, 1919, communication between the parties was available, although until July, 1921, a state of war between the United States and Germany still existed.

In Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265, a suit brought under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), to establish a debt claimed to be owing by enemy defendants, the court said: "The proposition that the enemy defendants, as a matter of law, are entitled to be relieved from interest during the war, cannot be sustained." That statement, taken as the law generally, must rest as authority for sustaining the less comprehensive proposition involved in the present case, that the enemy defendant, as a matter of law, cannot be relieved from interest after the cessation of the war and after July 3, 1919, the date when restrictions of intercourse between Germany and this country were removed. Robertson v. Miller (C. C. A.) 286 F. 503; Guinness v. Miller (D. C.) 291 F. 769.

[6] The contract fixed no rate of interest after Humphrey made his demand and it was refused. The court therefore was justi-

fied in allowing interest by way of damages as prescribed by the law of California. Equitable Trust Co. v. Western Pacific R. R. (D. C.) 244 F. 485; Robertson v. Miller (C. C. A.) 286 F. 503.

[7] No doctrine of estoppel will be applied against Humphrey because of the allegation in his complaint that a state of war existed from April 6, 1917, until July 2, 1921, and that during that period the bank was an alien enemy as defined by the Trading with the Enemy Act. As an averment of precise fact, that was accurate, and not in conflict with the fact that peace was established July 3, 1919.

[8] As already stated, the decree in favor of plaintiff was based on the value of the German mark as of June 12, 1915. Upon this phase of the case our view is that the rule controlling the measure of Humphrey's recovery is based upon the proper exchange at the time the demand was made. Guinness v. Miller, supra. That was a suit under section 9 of the Trading with the Enemy Act, by a citizen to recover a debt owed by a German on a stated account payable in marks. Judge Learned Hand stated that the only question was whether the decree should be the value in dollars of the marks when the account was stated, or for their value as of the date of the decree. In clear terms he pointed out that there is no sound basis for a distinction between torts and contracts to pay fixed sums of money, and regarded the form of the obligation as one to indemnify the victim for his loss in terms of the money of the foreign sovereign, saying "that obligation necessarily speaks as of the time when it arose; that is, when the loss occurred." Nor in Dante v. Miniggio, 298 F. 845, 54 App. D. C. 386, 33 A. L. R. 1278, did the court give favorable consideration to the contention that in actions of tort the rule differed from that on contract. In Page v. Levenson (D. C.) 281 F. 555, Judge Rose, in a carefully considered opinion, also held to the same general doctrine. Grunwald v. Freese, 4 Cal. Unrep. 182, 34 P. 73, is in harmony with the federal cases.

The appellant, in criticism of some of the cases referred to in Guinness v. Miller, supra, and Page v. Levenson, supra, says that the judges who wrote did not always discriminate between foreign debt contracted in a foreign country, payable in the foreign country, in the currency of the foreign country, and unliquidated damages, whether arising out of contract or out of tort. We shall not enter into a detailed analysis of the cases bearing upon that suggestion further than to say that the recent decisions in actions brought in tort or contract, apply the principle that if a bank is under obligation to pay money, marks in Germany upon a demand of a depositor in Germany, it should have the marks and make the payment; if it fails, and the depositor has to sue, the law ought to give him just as much as he would have received if the contract had been lived up to. In The Verdi (D. C.) 268 F. 908, which was an action for damages for a collision in New York, in 1915, between British owned ships, some of the repairs being made in New York and some in England, January 1, 1916, being taken as the date upon which all damages were ascertainable, the District Court decided that the damages should be determined by taking the rate of exchange existing on January 1, 1916. The argument was that damages could not be determined until final decree, because the action sounded in tort, and that the rate of exchange then prevailing should be adopted. Judge Augustus Hand said that the case was not one of transmitting pounds sterling to New York, but of finding their equivalent in dollars on January 1, 1916, and that could only be done by employing the rate of exchange prevalent at that date, and, as the initial damages were calculated in pounds, they must be converted into dollars at the par value of pounds at that time and place of payment. Judgment was based upon the value in United States currency of the equivalent of the foreign money on the date of the demand, rather than the date of the rendition of the judgment. It follows that the District Court was right in decreeing the date for establishing the rate of exchange was the date the moneys should have been paid in Germany; that is, June 12, 1915. Story on Conflict of Laws (8th Ed.) 426; Hoppe v. Russo Asiatic Bank, 235 N. Y. 37, 138 N. E. 497; note to De Ferdinando v. Smits, 11 A. L. R. 363; note to The Celia, 20 A. L. R. 899; Guinness v. Miller (C. C. A.) 299 F. 538.

The decree is affirmed.